IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

PATTI GODWIN,
    Plaintiff,

vs.                        Case No. 3:04cv298/RV/EMT

JO ANNE B. BARNHART,
Commissioner of the
Social Security Administration,
Defendant.

_____/

## REPORT AND RECOMMENDATION

    This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act and related statutes, 42 U.S.C. § 401, *et seq*. It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act for review of a final determination of the Commissioner of Social Security (Commissioner) denying Plaintiff's application for disability insurance benefits (DIB) under Title II of the Act.

I.    PROCEDURAL HISTORY

    Plaintiff filed an application for disability benefits on or about April 13, 1994,[1] alleging an onset of disability of May 10, 1993 (Tr. 44-46).[2] The application was denied initially (Tr. 47-48) and

---

[1] The application date is a constructive filing date based upon an earlier inquiry made by Plaintiff (*see* Doc. 5, Tr. at 285).

[2] All references to "Tr." refer to the Transcript of Social Security Administration Record filed on October 29, 2004 (Doc. 5).

OFFICE OF CLERK
U.S. DISTRICT CT.
NORTHERN DIST. FLA.
PENSACOLA, FLA.

05 AUG 31  PM 1:11

FILED

on reconsideration (Tr. 61-64). On November 2, 1994, Plaintiff requested a hearing before an Administrative Law Judge (ALJ) (Tr. 65). Her first hearing was held on September 12, 1995, before ALJ Glay E. Maggard (Tr. 350-70). A second hearing was held on March 12, 1996, also before ALJ Maggard (Tr. 371-94), because additional medical evidence was received and ALJ Maggard felt it necessary to "convene a supplemental hearing with a vocational advisor in attendance . . . " (Tr. 373). On May 25, 1996, ALJ Maggard found that Plaintiff was not under a disability as defined in the Social Security Act (Tr. 282-95). On September 11, 1997, the Appeals Council vacated the decision of the ALJ and remanded the case for further proceedings (Tr. 302-04). On March 9, 1999, a third hearing was conducted before ALJ Maggard (Tr. 395-421). On July 30, 1999, ALJ Maggard again found that Plaintiff was not under a disability at any time when she met the insured status requirements of the law (Tr. 10-24).[3] Plaintiff's request for review of the ALJ's decision was denied on August 14, 2004 (Tr. 6-9),[4] thus the decision of the ALJ stands as the final decision of the Commissioner and is therefore subject to review in this court. Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998).

On August 25, 2004, Plaintiff filed a Complaint, seeking judicial review of the Commissioner's decision (Doc. 1). On December 22, 2004, Plaintiff filed a Motion to Supplement the Record, requesting that the record be supplemented with additional medical evidence (Doc. 7). On June 22, 2005, Plaintiff's Motion to Supplement the Administrative Record was denied (Doc. 17). Plaintiff's appeal from the final decision of the Commissioner is now before this court.

II.   FINDINGS OF THE ALJ

The ALJ found that the period relevant to Plaintiff's claim is May 10, 1993 (alleged onset), to December 31, 1998 (date last insured) (Tr. 16). Plaintiff was 37 years of age on her alleged onset date, a "younger individual" as defined by the regulations, with a high school education and past relevant work as a clerk/secretary in the tax collector's office, a light duty job (Tr. 15). Plaintiff had

---

[3] For insured status under Title II of the Act, an individual is required to have 20 quarters of coverage in the 40-quarter period ending with the first quarter of disability. This is the so-called "earnings requirement." 42 U.S.C. § 416(i)(3)(B) and § 423(c)(1)(B). Plaintiff's insured status expired on December 31, 1998 (Tr. 14).

[4] The reason for the delay between the decision of ALJ Maggard and the decision to deny Plaintiff's request for review is not apparent from the record.

not engaged in substantial gainful activity since her alleged onset date (Tr. 18). The medical evidence established that Plaintiff has severe impairments including fibromyalgia[5] and carpal tunnel syndrome; she also has depression, but it is not severe (Tr. 23). However, Plaintiff does not have an impairment or combination of impairments listed in or medically equal to one listed in 20 C.F.R. Part 404; Subpart P, Appendix 1 (Tr. 23). Plaintiff's testimony regarding pain, other symptoms, and other limitations is not supported by evidence to the disabling degree alleged and therefore lacks credibility (Tr. 23). Plaintiff has the residual functional capacity ("RFC") to perform a limited range of light and sedentary work, and therefore can return to her past work as a clerk/secretary (Tr. 22, 24). Thus, Plaintiff was not under a "disability," as defined in the Social Security Act, at any time through December 31, 1998 (Tr. 24).

III.   STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) (stating "[t]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied"); *see also* Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987); Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997). "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir.1991). As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial

---

[5]"Fibromyalgia is a type of chronic pain syndrome affecting the soft tissues, which may, as cause or effect, involve some sort of psychological disorder or an abnormal response to stress. Typically patients describe deep aching, throbbing, or a burning feeling, and they may feel totally drained of energy." 6 Roscoe N. Gray & Louise J. Gordy, eds., Attorneys' Textbook of Medicine, ¶ 25.01 (3rd ed. 2000). Apart from muscle and soft tissue pain, both of which are "defining symptom[s]" of the disease, "the most common symptoms, present in more than two-thirds of patients, are undue fatigue, trouble sleeping (insomnia), and joint pains. Slightly less frequent but present in half or more of patients are recurrent headaches, jerky leg movements ('restless legs'), and numbness and tingling in various parts of the body. From one-third to one-half of patients have memory problems, trouble concentrating or leg cramps. About one-third of patients describe 'nervousness,' and one in five have major depression." *Id.*, ¶ 25.35.

evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995). Substantial evidence is more than a scintilla, but not a preponderance, i.e., "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting Consolidated Edison Co. V. NLRB, 305 U.S. 197, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)); Lewis, 125 F.3d at 1439. The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

A disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(g), the Commissioner analyzes a disability claim in five steps. The steps are:

1.  If the claimant is performing substantial gainful activity, she is not disabled.

2.  If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3.  If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.  If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5.     Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her residual functional capacity and vocational factors, she is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986); MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must then prove she cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.     PLAINTIFF'S PERSONAL, EMPLOYMENT AND MEDICAL HISTORY

A.     Personal and Employment History

Plaintiff was born on March 30, 1956, is married, is a high school graduate, and lives at home with her husband and daughter, born in or around 1987 (Tr. 280). She worked for the Okaloosa County tax collector's office as a clerk/secretary from September 1975 to May 1993 (Tr. 93). She stopped working there on May 10, 1993, because of the severity of her multiple health problems and the effects of the medications required to help control her pain (Tr. 94). Per Plaintiff, the medications cause severe constipation, frequent urination, sluggishness, and drowsiness (Tr. 360, 376). She claims she can only walk short distances, and can only stand or walk for a few minutes at a time (Tr. 281, 358). She can sit only in short intervals, but has pain when she is sitting; she cannot lift or carry more than a pound, nor bend, climb, or squat (Tr. 281, 357-58). She cannot mow the grass, wash dishes, mop or vacuum, but she can cook easily prepared meals and can grocery shop "at times" (Tr. 281). She has numbness in her hands which causes her to drop things (Tr. 378, 403). On an average day she walks or exercises, reads or watches T.V., rests, and cares for her daughter (Tr. 281). Plaintiff complains of headaches and daily chronic severe pain, both of which cause increased frustration, an inability to concentrate or maintain attention, depression and fatigue (Tr. 78, 357, 400, 404). Specifically, Plaintiff alleges disability based upon back pain, arthritis, shoulder and neck pain, fatigue, fibromyalgia, temporo mandibular joint ("TMJ") disorder, carpal tunnel syndrome ("CTS"), adhesions, and elevated cholesterol (Tr. 89, 97, 285).

B.    Medical History

In approximately July 1976, Plaintiff had a laparotomy at West Florida Hospital for an ovarian cyst. Findings were negative, but she "received the benefit of an incidental appendectomy" (Tr. 106). On September 9, 1976, Plaintiff was admitted to the General Hospital in Fort Walton Beach, Florida with pelvic pain (*id.*). A "laparoscopy with lysis of adhesions and coagulation of endometrial implant" was performed (Tr. 105). She was discharged three days later with a diagnosis of minimal pelvic adhesions and pelvic endometriosis (Tr. 105, 108). She was readmitted on February 28, 1977, and underwent an "exploratory laparotomy with excision of hydatid cyst and lysis of adhesions" (Tr. 109). Upon discharge, she was diagnosed with pelvic pain of undetermined etiology, hydatid cyst of Morgagni of the left tube, and pelvic adhesions (*id.*).

On July 29, 1986, Plaintiff saw Thomas Dlabal, M.D., who stated that she was developing bilateral CTS. He recommended that Plaintiff utilize wrist splints and avoid flexion of the wrist (Tr. 112). Plaintiff returned to Dr. Dlabal on August 8, 1986, at which time she received a Cortisone injection into her wrists. She was advised to return if she had any further difficulties (*id.*). The file contains no other records from Dr. Dlabal. On November 4, 1987, however, Plaintiff saw Bayard Miller, M.D., for complaints of pain and numbness in her hands (Tr. 114). She discussed her treatment by Dr. Dlabal and claimed that the wrist splints did not help, but the Cortisone injections relieved her discomfort "for a while" (*id.*). Dr. Miller diagnosed Plaintiff with "probable carpal tunnel syndrome" (*id.*). On November 24, 1987, after EMG and nerve conduction studies, Dr. Miller stated that Plaintiff had a "slight increase in terminal latency of the left median sensory and motor with mild decrease in amplitude," and a minimal increase in the right median motor sensory terminal latency, consistent with mild right CTS (*id.*). His overall impression was "mild bilateral carpal tunnel syndrome" that was improved. He suggested that Plaintiff not proceed with any intervention at that point, stating that her "symptoms have been almost completely resolved" (*id.*).

On October 9, 1990, Plaintiff saw Carson McKowen, M.D., and complained of CTS, neck pain, and backache (Tr. 135). She claimed that the neck pain and backache resulted from an injury a few months earlier when she was doing some heavy lifting at home (*id.*). Dr. McKowen, a neurosurgeon, found no Tinel or Phalen signs of CTS in her wrist. EMG and nerve conduction studies showed electrically mild median neuropathy, left worse than right, essentially unchanged

from an earlier test. Dr. McKowen also examined the results of a recent CT and cervical scan which showed a minor disc bulge. He described her present symptoms as minor, and noted they were not as severe as her previous ones and that her current studies did not suggest progressive nerve damage (*id.*).

Plaintiff was seen at the Crestview Chiropractic Clinic on April 4, 1990. She complained of back, shoulder, and neck pain resulting from lifting furniture (Tr. 131). She returned two days later complaining of severe pain, soreness and stiffness, and returned again on April 9, 1990, complaining of an "acute flare up" after cleaning her house (Tr. 128). During late April and early May 1990, she claimed her pain was worsening (Tr. 127-28), however a CT scan of the cervical spine taken on May 16, 1990, showed no fracture, no gross abnormalities, nor any evidence of disc impingement. An MRI was scheduled for May 30, 1990, but Plaintiff cancelled the procedure (Tr. 123).

Plaintiff saw Joe Carnley, D.M.D., between June 1991 and October 1993 for complaints of TMJ (Tr. 144-49). She advised Dr. Carnley that she was grinding her teeth at night, and developing "clicks" and a few headaches (Tr. 147). She was fitted with a splint and continued to receive adjustments.

Plaintiff was seen at the Crestview Physical Therapy Clinic from September 1, 1993, to October 12, 1993, after being diagnosed with fibromyalgia (Tr. 139-43). It was noted that she also had CTS, TMJ, a history of testing positive for acetylneuraminic acid ("ANA"), and soft tissue rheumatism (Tr. 142). She stated she cannot tolerate remaining in one position for very long and that her pain starts in the right side of her neck and goes down underneath her right shoulder blade. She does not have pain on the left side (*id.*). Her therapy consisted of heat, ultrasound, and general conditioning exercises. On October 12, 1993, Plaintiff stated she was feeling better and not having as much pain, and it was noted that she was tolerating the therapy well (Tr. 139).

Plaintiff saw Wayne Campbell, M.D., and John Johnson, M.D., between November 1989 and May 1994 for numerous complaints including a strained back, neck, and shoulder from moving furniture in May 1990; TMJ pain in September 1991; as well as general complaints of earaches, headaches, chest pain, throbbing in her feet, and Achilles tendinitis (Tr. 164-90).

Dr. Johnson referred Plaintiff to Jeff Chiccola, M.D., regarding her complaints of ear pain.

Dr. Chiccola examined her on June 12, 1991. His examination revealed that both ears were clear and that her "acute ear infections were under control" (Tr. 136). He noted Plaintiff's extensive dental work and thought her ear pain may be related to TMJ. He prescribed medication for Plaintiff and suggested that if she continued experiencing pain, she should return to Dr. Carnley for a dental evaluation (*id.*).

On July 29, 1991, Plaintiff reported complaints of throbbing in her left foot (Tr. 184). Dr. Johnson noted tenderness and an increased temperature during examination, and diagnosed Plaintiff with Achilles tendinitis (*id.*). X-rays were taken of Plaintiff's left foot and ankle in August 1991 and revealed some soft tissue swelling, but no fracture(s) (Tr. 181).

On December 1, 1994, Dr. Campbell completed a Physician's Report in which he concluded that Plaintiff was severely limited in her functional capacity, permanently incapable of any kind of work, and totally and permanently disabled from gainful employment (Tr. 255).

Jonathan Greer, M.D., a board certified internist and rheumatologist, saw Plaintiff from October 1991 to December 1994 (Tr. 195-221, 224). She was initially referred to Dr. Greer by Dr. Johnson for evaluation of a possible connective tissue disease (Tr. 215, 226). She advised Dr. Greer that her headaches, neck pain, and right-sided back pain resulted from an injury two to three years earlier and that her pain was "continuous." She also advised of left-sided TMJ pain (Tr. 215). She told Dr. Greer that in July 1991, she developed an abrupt onset of severe pain in both feet, with mild swelling in the right foot. Per Plaintiff, the discomfort extended into her legs and involved both calves and thighs (*id.*). She advised that excessive walking or weight-bearing activities made her condition worse (*id.*). An examination revealed some puffiness in her hands and feet, but no frank synovitis or effusions. She had full range of motion ("ROM") of all peripheral joins, including her shoulders, elbows, hips, knees, back, wrist, and hands. Dr. Greer concluded that Plaintiff "appeared to have signs and symptoms of soft tissue rheumatism characterized by diffuse right upper back and neck discomfort and bilateral lower extremity discomfort." Additionally, there was an incidental finding of positive ANA in low titer, which Dr. Greer thought was clinically insignificant (Tr. 214). He could not give her a diagnosis of systemic lupus erythematosus or any other inflammatory connective tissue disease, noting that "she just does not have enough in her clinical history to support any problem of this nature," although the possibility of fibromyalgia existed (Tr. 213-14). On

November 27, 1991, Dr. Greer noted that Plaintiff had several trigger points across her upper trapezius, ridge areas and intrascapular area. She also had discomfort in her knees, in the popliteal areas, and in her upper calves, but no signs of active swelling or effusions were present. She also had full ROM of all peripheral joints. Dr. Greer found that she appears "to have a component of fibromyalgia, but also a mild inflammatory process that is not easily explained" (Tr. 213). At other times Plaintiff complained of chest pain, etiology unclear (*see* Tr. 213), and continued with numerous trigger points across her upper trapezius ridge areas (*see* Tr. 211). Injections provided temporary relief from her pain and she continued to have full ROM of all joints with no signs of active synovitis or effusions (Tr. 201-02, 205, 211). Plaintiff was advised to participate in aerobic exercise, as Dr. Greer felt she was "severely deconditioned" and this was aggravating her problems (Tr. 205). An x-ray of Plaintiff's chest taken on January 9, 1992, revealed clear lungs and normal heart size (Tr. 209). On July 15, 1992, diagnostic imaging was done of her right shoulder and the impression was of "marginal subacromial space with otherwise negative shoulder with the exception of elongate right transverse process C7 which may or may not be associated with a fibrous band" (Tr. 204).

In March 1993, Dr. Greer noted that Plaintiff's fibromyalgia symptoms are "clearly related to her stresses at work" (Tr. 201). In May 1993, Plaintiff advised Dr. Greer that she quit work because she was required to travel at least seventy-five miles to work each day, which was aggravating her symptoms. She decided to quit work for this reason and Dr. Greer had "no objection"; in fact, he wrote a letter to her employer requesting that she not be moved from city to city (*id.*). He stated that Plaintiff "still has abundant signs of symptoms of persistent soft tissue rheumatism that has been difficult to manage. It is my feeling that she probably will improve if she stops work . . ." (*id.*). On August 10, 1993, an examination showed signs of soft tissue rheumatism, but Plaintiff had improved. Dr. Greer thought the improvement was due to the fact she had stopped working, which was a major stressor in her life and aggravated her symptoms (Tr. 199). On April 6, 1994, Dr. Greer stated that Plaintiff was doing much better, that her CTS symptoms were mild, and that she did not need her splints as much as she had in the past. Although she complained of discomfort in her neck, she had no radicular pain in her arms, nor any numbness, tingling, focal weakness or sensory loss. His overall impression was that she had mild soft tissue pain and CTS

symptoms, but was doing well (Tr. 198). In October 1994, Plaintiff returned to Dr. Greer and advised that she had not been doing well since her last visit in April. Dr. Greer's impression was that she had sustained a "flare of underlying fibromyalgia" (Tr. 196).

Dr. Greer was deposed by Plaintiff's counsel on December 16, 1994, concerning his course of treatment over the preceding three-year period (Tr. 222-40). He explained that his preliminary diagnosis was fibromyalgia, and even though Plaintiff tested positive for ANA, a lupus symptom, he did not believe she had lupus (Tr. 228). He conducted tests to rule out any other conditions such as low or high thyroid disease and diabetes, and found no other problems except for elevated cholesterol (Tr. 228-29, 234). Thus, he concluded Plaintiff indeed suffered from fibromyalgia and treated her accordingly (Tr. 229). He described fibromyalgia as diffuse soft tissue pain, characterized by tender points or "trigger points," poor sleep habits, loss of energy and overwhelming fatigue, all of which are aggravated by stress (Tr. 231-32). Dr. Greer testified that Plaintiff's fibromyalgia, coupled with her CTS, would "definitely" produce the pain of which Plaintiff complained (Tr. 231). He stated that Plaintiff would be restricted from any significant bending, stooping, squatting or climbing; she could stand or walk for only fifteen minutes at a time; she would have pain even when sitting; she would have to change positions or lie down frequently; her balance and coordination would be affected; and she could infrequently lift no more than five pounds at a time (Tr. 232-33). Her CTS could cause some loss of manipulation of her fingers and some loss of sensation; she could develop weakness in her hand muscles that could cause her to lose strength and coordination; and medications could interfere with her ability to concentrate, cause sluggishness, drowsiness, loss of coordination, and impaired judgment (Tr. 235-36). She would need to rest fifteen to thirty minutes every couple of hours and, in Dr. Greer's opinion, Plaintiff is not capable of any type of employment and has not been so since May 10, 1993 (Tr. 236-37).

In October 1997, at Dr. Campbell's request and following Dr. Greer's move from Pensacola to West Palm Beach, Plaintiff saw James M. Brown, M.D., a rheumatologist and board-certified internist (Tr. 315, 407). He was aware of Plaintiff's background, including CTS and possible fibromyalgia (Tr. 315). His examined Plaintiff and found "some trigger point tenderness" in the paracervical and scapular muscle groups (Tr. 316). She had "excellent" strength in her upper and lower extremities, full ROM in the small joints of her hands, wrists, elbows, shoulders, hips, knees,

ankles, and small joints of her feet (*id.*). Dr. Brown noted that Plaintiff was poorly compliant regarding wearing her wrist splints. He also noted her complaints of significant fatigue and tiredness. His impression was history of medical problems including hyperlipidemia; allergy to penicillin; chronic and recurrent sinus infection; symptom complex of chronic pain syndrome compatible with fibromyalgia, with associated complications of sleep disturbance, depression, and irritable bowel syndrome; and history of mild CTS (*id.*). Plaintiff was directed to return in six months. In the interim, Dr. Brown recommended exercise, mandatory weight loss, and consideration of antidepressant medication (*id.*). When Plaintiff returned in April 1998, she had excellent grip strength, full ROM of upper and lower extremities, no evidence of weakness, and no musculoskeletal findings (Tr. 311). Her blood count and immune profile looked "fine" (Tr. 309). Plaintiff returned in October 1998. Progress notes from that visit show trigger point tenderness in the paracervical and scapular muscles, as well as recurrent paresthesias and numbness in the median nerve distributions of both hands, although grip strength remained well maintained (Tr. 346). Lab work was noted to be stable (*id.*). Dr. Brown recommended exercise and ROM activities (*id.*). His impression was "fibromyalgia, deconditioning, obesity, and bilateral CTS" (*id.*).

An x-ray of Plaintiff's lumbar spine taken on July 29, 1998, showed only "mild scoliosis," which could be due to muscle spasm or her positioning during the examination (Tr. 319). An x-ray of the cervical spine on the same day was unremarkable (Tr. 318).

C.     Consultative Examination History

Nicholas Malamos, M.D., an internist, performed a consultative examination on October 30, 1995 (Tr. 266-69). Plaintiff told him she had chronic neck, back and shoulder pain, which worsened after prolonged sitting, and therefore she could not return to her former job which required her to sit for prolonged periods of time (Tr. 266). Dr. Malamos' exam revealed a slightly reduced ROM of Plaintiff's neck; some tenderness in the cervical area of her back, with slightly increased paraspinal muscle tone; flexion, extension and rotation at her waist were reduced; straight leg raises were negative; and there were "bilateral negative Tinel's sign" (Tr. 267). Neurologically, sensation to soft and sharp touch was subjectively decreased in the upper extremity, but normal in the lower extremity (*id.*). Dr. Malamos' assessment was fibromyalgia, possible lupus, low back pain and hypercholesterolemia (*id.*). He indicated that Plaintiff could sit and walk for two hours at a time and

stand for five hours at a time. In an eight-hour workday she could sit for a total of seven hours, and stand and walk for a total of three hours. She could lift up to twenty-five pounds occasionally, ten pounds frequently, and five pounds continuously. She could carry up to twenty pounds occasionally and ten pounds frequently. She had no restriction regarding the use of her hands or feet for repetitive movement. She could occasionally bend and squat, but could never crawl, climb or reach. She could not work at unprotected heights; was moderately restricted from being around moving machinery; and mildly restricted from exposure to marked changes in temperature and humidity, driving automotive equipment, and exposure to dust, fumes and gasses (Tr. 268).

On August 12, 1998, Plaintiff was referred to Dr. Daniel Bader for a Social Security neurological evaluation (Tr. 320-25). He noted her history of CTS, back injury, and fibromyalgia (Tr. 320). His physical examination revealed that Plaintiff had no neurologic abnormalities, except for a "questionably positive Tinel's sign at the wrist"; her gait was normal; and her muscle strength and tone were "normal throughout" (Tr. 322-23). He opined that Plaintiff could use her hands for repetitive actions such as simple grasping, pushing and pulling of arm controls, and fine manipulation (Tr. 324). She could use both feet for pushing and pulling of foots controls. She had no restriction of activities involving unprotected heights; being around moving machinery; exposure to marked changes in temperature and humidity; driving automotive equipment; or exposure to dust, fumes and gasses (id.).

Finally, Plaintiff was seen by Eugene Valentine, a board-certified psychiatrist, for a Social Security disability evaluation on December 16, 1998 (Tr. 326-32). His impression was dysthymic disorder and psychological factors affecting medical conditions (Tr. 329). He also found that "psychosocial stressors" were severe and recommended psychotherapy and antidepressant medications (id.). He assessed Plaintiff's ability to do work-related mental activities, finding her to be "poor"[6] in the use of judgment; dealing with work stress; functioning independently; maintaining attention and/or concentration; understanding, remembering and carrying out complex or detailed job instructions; maintaining personal appearance; behaving in an emotionally stable manner; relating predictably in social situations; and demonstrating reliability (Tr. 331-32). He opined that

---

[6]"Poor" is defined as "ability to function in this area is seriously limited but not precluded."

Plaintiff is chronically depressed and could not function at her past work due to crying on the job, noting that she becomes easily frustrated with stress (Tr. 333).

    D.     Vocational Abilities

A vocational expert ("VE") testified at Plaintiff's final hearing before ALJ Maggard and classified Plaintiff's prior work at the tax collector's office as "light duty" (Tr. 417). When asked to consider the limitations set forth in Dr. Malamos' report (*see* Tr. 266-68), the VE indicated that Plaintiff could return to her past work (Tr. 417). The VE was then asked to consider the testimony of Dr. Greer (*see* Tr. 222-40). However, the VE was not given an opportunity to read Dr. Greer's deposition; instead, the ALJ summarized his entire testimony as follows: "That she can do no significant bending, stooping, or climbing; no standing or walking over 15 minutes at a time; must be able to change positions frequently while sitting; limits it to five pounds; and rest periods every 15 to 20 - - 15 to 30 minutes every two hours. Could she still do her work at the tax collector's office?" (Tr. 417-18). The VE started to answer "no," explaining that Dr. Greer's limitations (i.e., those articulated by the ALJ) placed her in a sedentary range and that the tax collector job was light duty, but she was interrupted by the ALJ (Tr. 418).[7] Later, however, the VE was able to definitively answer "no," Plaintiff could not return to her former job with those limitations (Tr. 418). Although the ensuing questions and answers are somewhat disjointed, the ALJ's questions and the VE's responses suggest that if Plaintiff merely needed to change positions frequently while sitting, she could perform work as a clerk/secretary because it is light duty and she would be able to frequently change positions (Tr. 419). However, if Plaintiff truly was unable to sit for prolonged periods of time, and had a loss of sensation in her fingers with a resulting inability to manipulate, she could not work at all; in other words, "this would . . . just about eliminate all sedentary work" (Tr. 420). Similarly, if the VE were to accept all the limitations set by Dr. Greer and the mental limitations set

---

[7]It should be noted that the ALJ seemed quite annoyed, stating to the VE that "if I wanted just a definition, I'd look in the <u>DOT</u>. I want you, as a vocational person, to tell me whether a person with these capacities and limitations can do the tax collector clerk's job or not," even though the VE's answer was appropriate and responsive. The ALJ additionally demonstrated his annoyance with the whole proceeding by belittling the Appeals Council's reversal of his unfavorable decision rendered in 1996, stating that he finds it "hysterical, in the AC remand, they say that I did not consider Dr. Greer's opinion, and that is where the hypothetical is taken from, and that's one of the findings in my decision, is Dr. Greer's. But I didn't consider it. I just find it amusing." (Tr. 418-19).

by Dr. Valentine, or accept Plaintiff's testimony as credible, Plaintiff could do no work (Tr. 420-21).

V.    DISCUSSION

Plaintiff contends the ALJ erred: 1) in failing to fairly and fully develop the record (Doc. 9 at 13); 2) in failing to give "any" weight to the opinion of consulting physician Dr. Valentine (*id.* at 24); and 3) in failing to give "great" weight to the opinion of Dr. Greer, Plaintiff's treating physician (*id.* at 16). Plaintiff seeks a reversal and the "full award of disability benefits" (*id.* at 26). Defendant maintains that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

A.    Development of the Record

The ALJ has a duty to fully and fairly develop the record. Graham v. Apfel, 129 F.3d 1420, 1422 (11th Cir. 1997); Welch v. Bowen, 854 F.2d 436, 438 (11th Cir. 1988); Cowart v. Schweiker, 662 F.2d 731, 735-36 (11th Cir. 1981). The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel, as in the instant case. *See* Cowart, 662 F.2d at 735-36. Remand due to a failure to develop the record is only warranted where such a failure is unfair or prejudicial. *See* Brown v. Shalala, 44 F.3d 931, 935 (11th Cir. 1995). In Graham, the court held that the record did not "show the kind of gaps in the evidence necessary to demonstrate prejudice." Graham, 129 F.3d at 1423.

Plaintiff alleges the ALJ failed to fully and fairly develop the record by "failing to request or inquire about materially relevant medical records which he knew were in existence" (Doc. 9 at 13). Specifically, Plaintiff contends the ALJ was aware of the existence of Dr. Greer's treatment records, covering the period from April 4, 1996, to February 17, 1997, but failed to make any attempt to obtain these "clearly relevant and material" records (Doc. 9 at 14-15). However, contrary to Plaintiff's argument, the records at issue are not material. They consist of three additional treatment records from Dr. Greer (*see* Doc. 7, Ex. A), which are consistent with his other treatment records and are therefore cumulative. Furthermore, these records are the same records at issue in Plaintiff's Motion to Supplement the Record (Doc. 7). For the reasons detailed in this court's order denying Plaintiff's motion (Doc. 17), the court concludes that the existing record contains ample evidence from which a determination may be made and does not contain gaps demonstrating any prejudice to the Plaintiff. Accordingly, the ALJ did not err in failing to obtain these records.

B.    Consultative Examiner's Opinion

The ALJ gave no significant weight to Dr. Valentine's opinion concerning Plaintiff's mental limitations.[8] Plaintiff claims the ALJ erred in this regard, but this court finds no error.

As a one-time consultative examiner, Dr. Valentine's opinion is not entitled to deference. *See* McSwain v. Bowen, 814 F.2d 617,619 (11th Cir. 1987) (citing Gibson v. Heckler, 779 F.2d 619, 623 (11th Cir. 1986)).  Moreover, the ALJ throughly considered Plaintiff's alleged depression and discussed his reasons for giving insignificant weight to Dr. Valentine's opinion, including the fact that Plaintiff had no history of mental illness, had never been referred to mental health professionals or mental health counseling, and had never been prescribed medication for a mental impairment (Tr. 21). The ALJ's reasons are sound and are supported by the record.  Notably, although Plaintiff's treating physicians noted possible symptoms of depression (i.e., difficulty with stress (Tr. 202), flat affect (Tr. 315-16)), none ever referred her to any type of mental health treatment or counseling. Although Dr. Brown recommended antidepressant medication (*see* Tr. 316), the record contains no evidence that Plaintiff followed this recommendation (*see, e.g.*, Tr. 194).  A claimant's failure to seek treatment is a proper factor for the ALJ to consider.  *See* Watson v. Heckler, 738 F.2d 1169, 1173 (11th Cir. 1984) (in addition to objective medical evidence, it is proper for ALJ to consider use of pain-killers, failure to seek treatment, daily activities, conflicting statements, and demeanor at the hearing).  Furthermore, absence of treatment indicates that a mental impairment is non-severe.  *See e.g.*, Williams v. Sullivan, 960 F.2d 86, 89 (8th Cir. 1992).  Thus, the ALJ properly gave insignificant weight to Dr. Valentine's opinion and did not err in finding that Plaintiff's mental impairment was non-severe.

C.    Treating Physician's Opinion

Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. *See* Lewis v. Callahan, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991);  Sabo v. Commissioner of Social Security, 955 F.Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527 (d).  If a treating physician's opinion on the nature and severity of a claimant's impairments is

---

[8]Those limitations exclude Plaintiff from all work and render her totally disabled (Tr. 331-32, 420).

Case No. 3:04cv298/RV/EMT

well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527 (d)(2). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See* Edwards, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See* Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also* Schnor v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987). When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on 1) the length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) medical evidence supporting the opinion; 4) consistency with the record a whole; 5) specialization in the medical issues at issue; and 6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527 (d). Generally, a treating physician's opinion is entitled to more weight than a consulting physician's opinion. *See* Wilson v. Heckler, 734 F.2d 513, 518 (11th Cir.1984); *see also* 20 C.F.R. § 404.1527 (d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527 (e). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because those ultimate determinations are the providence of the Commissioner. 20 C.F.R. § 404.1527 (e).

Here, the ALJ relied on the opinions of one-time consultative examiner Dr. Malamos (an internist, not a rheumatologist) in finding that Plaintiff could return to her former work (*see* Tr. 266-69, 417). In contrast, the ALJ discounted the opinion of treating physician Dr. Greer, finding that his treatment notes do not support a totally disabled individual, the notes demonstrate that Plaintiff

responded favorably to treatment, and the notes are inconsistent with the treatment records of Dr. Brown (Tr. 19).

As detailed above, Dr. Greer is a board certified rheumatologist who treated Plaintiff over several years on a regular basis, and he was quite confident regarding his diagnosis of fibromyalgia. The diagnosis of fibromyalgia is based largely on the patient's subjective complaints, and positive laboratory findings are simply unavailable. The disease has been recognized by The American College of Rheumatology as both real and difficult to confirm:

> Fibromyalgia is especially confusing and often misunderstood because almost all its symptoms are also common in other conditions. . . . Unfortunately, because certain symptoms lack physical and laboratory findings (signs), but depend mostly on a person's report of complaints and feelings (symptoms), these syndromes are often viewed as not being real or important.
> Arthritis Information: Fibromyalgia (1992), Arthritis Foundation & American College of Rheumatology.

The American College of Rheumatology has developed diagnostic criteria by which a person can be affirmatively diagnosed with the condition if he or she has widespread pain in combination with tenderness in at least 11 of 18 specific tender point sites. *See* National Institute of Arthritis and Musculoskeletal and Skin Diseases, Questions and Answers About Fibromyalgia (1999), available at http://www.niams.nih.gov/hi/topics/fibromyalgia/fibrofs.htm. The Seventh Circuit has held that requiring positive laboratory findings is error in cases of this nature. Sarchet v. Chater, 78 F.3d 305 (7th Cir. 1996) (ALJ erred in finding claimant non-disabled because of lack of positive laboratory tests) (cited approvingly in Stewart v. Apfel, 245 F.3d 793 (11th Cir. 2001) (table), 2000 U.S. App. LEXIS 33214 (unpublished opinion)[9]). In Stewart, the court reviewed medical research on fibromyalgia, noting that it often lacks medical or laboratory signs, is generally diagnosed mostly on an individual's described symptoms, and its hallmark is a lack of objective evidence. Thus, the ALJ's determination that a fibromyalgia claimant's testimony was incredible, based on the lack of objective evidence documenting the impairment, was reversed. Stewart, 245 F.3d at 793, 2000 U.S.App. LEXIS 33214, at *9, n. 4. More recently, the Eleventh Circuit addressed fibromyalgia in

---

[9]Unpublished decisions of the Eleventh Circuit are not binding precedent. *See* 11th Cir. R. 36–2.

the case of <u>Moore v. Barnhart</u>, 405 F.3d 1208, 1211 (11th Cir. 2005). The court reiterated the impropriety of focusing on the absence of objective findings corroborating claims of the impairment.

Other Circuits that have considered the issue have found that fibromyalgia is a disease that can serve as the basis for a medically determinable impairment, even without positive laboratory findings. *See, e.g.,* <u>Kelley v. Callahan</u>, 133 F.3d 583, 589 (8th Cir. 1998) ("Fibromyalgia, which is pain in the fibrous connective tissue components of muscles, tendons, ligaments, and other white connective tissues, can be disabling."); <u>Preston v. Secretary of Health & Human Services</u>, 854 F.2d 815, 817-18 (6th Cir. 1988) ("Fibrositis [now fibromyalgia] causes severe musculoskeletal pain which is accompanied by stiffness and fatigue due to sleep disturbances," and diagnosis involves testing for focal tender points.) Indeed, the Commissioner has instructed that in cases of chronic fatigue syndrome, a condition that, like fibromyalgia, is based largely on self-reported symptoms, "[p]ersistent, reproducible muscle tenderness on repeated examinations, including the presence of positive tender points" is an example of a medical sign that establishes the existence of a medically determinable impairment. Social Security Ruling 99-2p, 1999 WL 271569 (1999).

The ALJ erred in failing to give substantial weight to Dr. Greer's opinion that Plaintiff suffered from fibromyalgia, and that the disease created significant limitations affecting her ability to work, a conclusion also reached by Dr. Campbell, another of Plaintiff's treating physicians. Generally, opinions expressed by treating physicians are due such weight, but that deference is heightened when a treating physician makes a disability determination based on the condition of fibromyalgia. *See* <u>Morrison v. Barnhart</u>, 278 F. Supp. 2d 1331, 1335 (M.D. Fla. 2003) (citing <u>Stewart</u>, 245 F.3d at 793). Additionally, rheumatologists are the type of specialists best qualified to diagnose fibromyalgia and determine its impact upon an individual; therefore, their disability opinions are more significant. *See* <u>Stewart</u>, 2000 U.S.App. LEXIS 33214, at *8; *see also* <u>Burroughs v. Massanari</u>, 156 F.Supp.2d 1350, 1367 (N.D. Ga. 2001) (acknowledging that a specialist in rheumatology is better qualified to diagnose fibromyalgia and gauge its effects on an individual); 20 C.F.R. § 404.1527(d)(5) (stating that specialists' opinions on medical issues related to their area of specialty are generally given more weight).

The ALJ's reasons (i.e., the "good cause") for rejecting Dr. Greer's opinion are insufficient. This court does not agree with the ALJ's finding that Dr. Greer's opinion is unsupported by his own

records. In making this finding, the ALJ recited several statements contained within Dr. Greer's records, but seemingly ignored others. For instance, the ALJ characterized Dr. Greer's May 12, 1993, treatment notes as ones concerned mainly with Plaintiff's desire to quit her job (Tr. 19). However, the same notes also include Dr. Greer's findings of "abundant" signs of soft tissue disease, which were characterized as difficult to manage, as well as his opinion that Plaintiff's condition will improve if she stops working (Tr. 201). The ALJ noted Plaintiff's August 10, 1993, appointment with Dr. Greer where he found: "she had full range of motion of all joints, her grip strength was excellent, and bilateral straight leg raising tests were negative" (Tr. 19), but the ALJ failed to mention Dr. Greer's findings of "numerous" trigger points; his impression that Plaintiff had prominent soft tissue rheumatism; and his opinion that Plaintiff's condition "has improved since she has stopped work, which apparently was a major stressor in her life, and clearly was aggravating her symptoms" (Tr. 199). The ALJ cited Dr. Greer's December 8, 1993, notes as evidencing no findings and suggesting that her condition had improved with "medical therapy" (Tr. 19). However, when these notes are read in the context of Dr. Greer's other records, it appears that Dr. Greer is stating that Plaintiff was doing well *as compared to his other exams*. Nevertheless, the ALJ failed to point out that those same treatment notes reflect Plaintiff's continued complaints regarding medication side effects, pain, and numbness and tingling in her fingers (Tr. 198-99). The ALJ also omitted Dr. Greer's belief that Plaintiff's improved condition was causally related to no longer working: "Clearly there is a relationship between her stress at work and her musculoskeletal symptoms" (Tr. 198). The ALJ correctly noted Plaintiff's April 6, 1994, visit where Dr. Greer described her pain and symptoms as mild, and stated that overall Plaintiff was doing well. However, notes from that visit also contain Dr. Greer's preference that Plaintiff remain out of work indefinitely, again reiterating his strong belief that Plaintiff's condition was aggravated by working. Accordingly, the ALJ erred. *See* Zurawski v. Halter, 245 F.3d 881, 888 (7th Cir. 2001) (reversing and remanding the ALJ's decision where the ALJ mentioned only the medical evidence favoring denial of benefits).

Additionally, the fact that Plaintiff responded favorably to treatment, on occasion, is of no consequence. Although her condition responded favorably on August 10, 1993, December 8, 1993, and April 6, 1994 (Tr. 198-99), her improvement was attributed to the fact she had stopped working. Dr. Greer testified that during his treatment it became apparent that Plaintiff's work activities were

aggravating her condition (Tr. 229). He asked Plaintiff to consider stopping work in order to improve her overall condition (Tr. 229). Nonetheless, the evidence also consists of periods where Plaintiff's condition was worse. For example, on October 5, 1994, and April 3, 1995, her condition had deteriorated or was more severe than the period after her condition was said to have responded well to treatment (Tr. 258-59).

Finally, the ALJ erred in finding that Dr. Greer's opinion was inconsistent with that given by Dr. Brown (Tr. 19). The ALJ stated that "Dr. Brown has not rendered a supportive disability opinion or placed restrictions on her residual functional capacity" (Tr. 19), but Dr. Brown was never asked to provide a disability opinion or rate the level of Plaintiff's functional abilities; thus, he has provided neither a supportive nor non-supportive opinion. He did provide a consistent diagnosis of fibromyalgia and observed "trigger point tenderness," a known medical sign of the impairment. Additionally, although Dr. Brown noted good strength and full ROM, he saw Plaintiff on only three occasions (October 1997, April 1998, and October 1998), near the end of the time period relevant to this claim (May 1993 to December 1998) and well after Plaintiff had discontinued working. As noted by Dr. Greer, Plaintiff symptoms were greatly aggravated by the stress of work, so it is not surprising that Dr. Brown observed Plaintiff in a better physical state because she had not worked for more than four years when she first saw him.

In sum, this court finds that none of the reasons offered by the ALJ for rejecting Dr. Greer's opinion regarding Plaintiff's ability to engage in work-related activities is supported by substantial evidence when proper legal criteria are applied. Accordingly, because Dr. Greer's testimony was improperly refuted by the ALJ, it must be accepted as true, including his testimony that Plaintiff's condition would "definitely" produce the pain she alleged (see Tr. 231). See MacGregor v. Bowen, 786 F. 2d 1050, 1058 (11th Cir. 1986).

VI.   CONCLUSION

In Social Security cases, the role of this court is to determine whether the law has been properly applied and whether substantial evidence supports the Commissioner's findings, not to find facts. Because of this limited role, the general rule is to reverse and remand for additional proceedings when errors occur. See, e.g., Davis v. Shalala, 985 F.2d 528, 534 (11th Cir.1993) (referring to general practice); Holt v. Sullivan, 921 F.2d 1221, 1223-24 (11th Cir.1991). A case may

be remanded for an award of disability benefits, however, where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. Davis, 985 F.2d at 534; see also Bowen v. Heckler, 748 F.2d 629, 636 (11th Cir.1984) (if the Commissioner's decision is in clear disregard of the overwhelming weight of the evidence, Congress has empowered the courts to modify or reverse the decision with or without remanding the case for a rehearing); Carnes v. Sullivan, 936 F.2d 1215, 1219 (11th Cir.1991) ("The record . . . is fully developed and there is no need to remand for additional evidence."); Elam v. Railroad Retirement Bd., 921 F.2d 1210, 1216-17 (11th Cir. 1991); (finding that improperly refuted testimony of a treating physician must be accepted as true and remanding "with directions to enter a finding of total disability").

Accepting Dr. Greer's testimony as true, the vocational expert has testified that Plaintiff could perform no available work (see Tr. 420). Thus, this court finds that a remand would serve no purpose. Furthermore, this court is not unmindful of the substantial and unexplained five-year delay between ALJ Maggard's unfavorable decision in 1999 and the Appeal Council's decision to decline review in 2004, nor of the fact that Plaintiff, who filed her initial application for benefits in April 1994, has waited more than eleven years for a final decision in this matter.

Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **REVERSED**, that this action be **REMANDED** to the Commissioner to enter a finding of total disability and award disability benefits, and that the clerk be directed to close the file.

At Pensacola, Florida this 31st day of August, 2005.

**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**Any objections to these proposed recommendations must be filed within ten days after being served a copy hereof. A copy of any objections shall be served upon any other parties. Failure to object may limit the scope of appellate review of factual findings. See 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**

Case No. 3:04cv298/RV/EMT